# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-07-00301-CR

**Joe Luis Astran, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. D-1-DC-05-201124, HONORABLE DONALD LEONARD, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

On March 4, 2005, appellant Joe Luis Astran fatally stabbed Steve Castillo in a bedroom of the house appellant shared with two of his brothers, Juan and Adam. Appellant gave a statement to the police claiming that he acted in self-defense. The jury concluded, however, that appellant intentionally murdered Castillo in the course of committing robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2007). The State did not seek the death penalty, and the trial court imposed the mandatory sentence of life imprisonment. *See id*. § 12.31(a); Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West 2006).

Appellant contends that the evidence is factually insufficient to sustain the jury's verdict. He also urges that his challenges to two potential jurors were erroneously overruled. We overrule these contentions and affirm the conviction.

The State's principal witness was appellant's brother, Adam Astran. Adam testified that Castillo, a drug dealer, and another man named Jay, later identified as Jason Gonzales, came to the Astran house on the afternoon of March 4. The brothers wished to buy some crack cocaine, but they had no money and Castillo was unwilling to give them credit. Castillo and Jay soon left, and Adam spent the rest of the afternoon watching television in the living room while appellant and Juan were together in the kitchen. About 9:00 p.m., appellant gave Adam twenty dollars and asked him to go buy some beer and other supplies.[1] Adam said that this errand took about thirty minutes. When he returned to the house, appellant and Juan were in Adam's bedroom. Adam testified that his bedroom was often used to "party" because it was at the back of the house and had a separate entrance into the back yard. Adam knocked on the closed bedroom door, which appellant opened just wide enough for Adam to hand him two cans of beer. Adam then returned to the living room and resumed watching television and drinking beer.

Adam testified that he began to hear loud noises in his bedroom. When he went to investigate, the bedroom door was locked. Looking through a crack in the door frame, Adam caught a glimpse of Castillo. He and appellant were arguing. Adam began to knock on the door and Juan opened it.[2] Adam entered the room and found appellant and Castillo on the bed, struggling with each other. Appellant was on top of Castillo and brandishing a knife. According to Adam, appellant told Castillo, "I know you have got some more. This ain't all." Castillo managed to break away from appellant and ran for the back door, but appellant and Juan seized him and forced him to the floor.

___

[1] It is unclear where appellant got this money.

[2] Adam would later say that he was unsure whether it was Juan or appellant who opened the door.

Castillo was lying face-down with appellant kneeling on his shoulders and Juan sitting on his legs. Appellant began to stab Castillo repeatedly on the back of the neck and head.

Adam testified that he "just froze" as Castillo pleaded for his life and appellant continued to stab him. Although he urged appellant to stop stabbing Castillo, Adam said he did nothing to stop the attack. At one point, appellant demanded that Adam help him, but Adam refused. Adam estimated that the attack lasted about twenty minutes. When Castillo appeared to be dead, Adam left the bedroom and returned to the living room. He did not call the police. After a few minutes, he returned to the bedroom. Appellant and Juan were smoking crack and discussing how to dispose of Castillo's body, which they had wrapped in a bedspread. Adam returned to the living room and fell asleep on the couch.

Adam awoke at 6:00 a.m. the next morning. Appellant and Juan were asleep. Adam walked to his sister's house, which was about four blocks away, and told her what had happened. They then called the police, who arrested appellant and Juan as they left the house later that morning.

Police found Castillo's body in the bedroom, wrapped in a bedspread. The broken blade of a butcher knife and a metal screwdriver were still lodged in the back of his neck. During the autopsy, the medical examiner counted thirty-five stab or cut wounds to Castillo's head and neck. He also found defensive cuts on Castillo's hands, a bite mark on his shoulder, and abrasions on his knees. The cause of death was loss of blood.

Jason Gonzales testified that he and Castillo regularly sold drugs to the Astran brothers and that it was generally Adam who would initiate the transactions. He confirmed that he and Castillo were at the Astran house on the afternoon of March 4, and that the brothers had

3

no money to buy cocaine. Gonzales said that he and Castillo went to a nearby friend's house after leaving the Astrans. Gonzales said that as it was getting dark, he noticed that Castillo was no longer there. He called Castillo on his cell phone, and Castillo told Gonzales that he had returned to the Astran house. Gonzales testified that Castillo had about $300 in cash that afternoon. He also testified that he had never known Castillo to carry a gun.

Gloria Garza, who also admitted dealing in drugs, testified that appellant called her at approximately 8:30 p.m. on March 4. Appellant told Garza that he had money and wanted to purchase crack cocaine. Garza said that she arrived at the Astran house at about 9:00. Appellant gave her $150 for the crack and an additional $90 that he owed her. About an hour later, Garza returned to the house and sold appellant an additional $70 worth of crack.

In his statement to the police, appellant said that Castillo had four rocks of crack cocaine when he returned to the Astran house on March 4. Appellant told Castillo that "they really wasn't that good." Castillo "got upset" and "started saying that he had a gun in his pocket and putting his hands back there." Appellant said that Castillo "started threatening me." According to appellant, "[Castillo] was using words like my friends were coming to help. That's when I grabbed the knife and we scuffled. He took the knife away from me and stabbed me in the leg." With Juan's help, appellant got the knife back from Castillo and the two men began to wrestle. "He was still acting like he had a gun and he grabbed a back pack with tools in it and was looking for a weapon." Appellant said that Castillo tried to take the knife from him again, so "I had to defend myself." As Juan held Castillo, appellant stabbed him with the knife. After the knife broke, appellant grabbed the screwdriver and "put it right inside where the knife was too, in the neck." Appellant said that

4

Castillo "came in with the intention to murder and praising the devil. Although there was no gun but I didn't know." In the statement, appellant admitted using the money he found in Castillo's pocket to buy crack.

Appellant had cuts on his hands and his leg when he was arrested. The medical examiner testified that these could have been defensive wounds. He also said, however, that the cuts on appellant's hands might have been the result of his hand slipping on the bloody knife as he stabbed Castillo.

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal sufficiency); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Due deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, but the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust,

5

or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Appellant's argument in support of his claim that the evidence is factually insufficient is, for the most part, an attack on Adam Astran's credibility. Appellant accurately points out that Adam contradicted himself repeatedly during his direct and cross-examinations, and that he also contradicted statements he had made previously to the police and the grand jury. Adam had a record of convictions for drug possession and assault, and he was under indictment for an unrelated robbery at the time of the trial. Adam admitted during cross-examination that he had told the prosecutors that he "hope[d] they can do something for me." But even if, as appellant suggests, Adam falsely minimized his own role in the homicide, the key point in Adam's testimony—that appellant fatally stabbed Castillo during a physical struggle—was and is undisputed by appellant. The issue at the trial was not whether appellant killed Castillo, but whether appellant killed Castillo in the course of a robbery or in self-defense.[3] Evidence that the killing was part of a robbery came not only from Adam, but also from Gonzales and Garza, who testified that appellant had no money to buy drugs on the afternoon of March 4 but had hundreds of dollars to purchase cocaine later that night after Castillo had been killed. Even appellant admitted, in his statement, that he used Castillo's money to purchase drugs. Considering all the evidence in a neutral light, we hold that the evidence supporting the jury's verdict is not so weak as to make the finding of guilt clearly wrong or manifestly unjust, and that the verdict is not against the great weight and preponderance of the available evidence. Point of error one is overruled.

---

[3] The jury was instructed on the law of self-defense.

In his second point of error, appellant urges that the trial court erred by overruling his challenges to venire members Conti and Groce. In order to show harm from the denial of a challenge for cause, a defendant must use all of his peremptory challenges, must request and be denied an additional peremptory challenge, and must identify another venire member on whom he would have used the additional peremptory challenge and who actually sits on the jury. *Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004). After his challenges to Conti and Groce were overruled, appellant was denied two additional peremptory challenges. Appellant then identified panelists Foroughi and Mughal as objectionable jurors whom he would have struck had he been given the challenges. The record reflects, however, that panelists Foroughi and Mughal were struck by the State and did not serve on the jury. Therefore, any error in overruling appellant's challenges for cause was not harmful. Point of error two is overruled.

The judgment of conviction is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: April 16, 2008

Do Not Publish